## Commonwealth ex rel. Pacewicz, Appellant, v. Turley.

Argued January 12, 1960. Before Jones, C. J., Bell, Musmanno, Jones, Cohen, Bok and Eagen, JJ.

*Donald J. Goldberg,* with him *Garfield W. Levy,* for appellant.

*Arlen Specter,* Assistant District Attorney, with him *Domenick Vitullo,* Assistant District Attorney, *Paul M. Chalfin,* First Assistant District Attorney, and *Victor H. Blanc,* District Attorney, for appellee.

Opinion by Mr. Justice Benjamin R. Jones, May 4, 1960:

Edward Pacewicz, the relator, on April 25, 1959 was arrested in Philadelphia County and placed in custody pending extradition proceedings for his return to the State of New York. On July 14, 1959 the Governor of this Commonwealth approved the requisition for Pacewicz's extradition. On November 5, 1959 the

relator filed a petition for a writ of habeas corpus in the Court of Common Pleas No. 2 of Philadelphia County for the purpose of securing his release from custody. On November 6, 1959, a hearing was held before Judge HAGAN and, after hearing, writ of habeas corpus was denied. From that order the present appeal was taken.

Relator raises two questions: (1) whether the court below acted fairly and impartially and (2) whether the failure of the Commonwealth to introduce into evidence the extradition warrant issued by the Governor of this Commonwealth entitled relator to a discharge from custody.

Under the Uniform Criminal Extradition Act of July 8, 1941, P. L. 288, 19 PS §191.1 et seq., the courts of an asylum state do not determine the guilt or innocence of the party sought to be extradited. Courts of the asylum state will order extradition if (1) the subject of the extradition is charged with a crime in the demanding state; (2) if the subject of the extradition was present in the demanding state at the time of commission of the crime charged; (3) if the subject of extradition is a fugitive from the demanding state; (4) if the requisition papers are in order: *Commonwealth ex rel. Dronsfield v. Hohn,* 390 Pa. 434, 135 A. 2d 757; *Commonwealth ex rel. Hatton v. Dye,* 373 Pa. 502, 96 A. 2d 127.

On this type of appeal our scope of review is limited to an inquiry as to whether the court of first instance had jurisdiction of the subject matter and whether the proceedings conducted therein were regular and in conformity with law: *Commonwealth ex rel. Hunt v. Groman,* 169 Pa. Superior Ct. 68, 82 A. 2d 278; *Commonwealth ex rel. Mills v. Baldi,* 166 Pa. Superior Ct. 321, 70 A. 2d 439; cert. den. 339 U. S. 986, 70 S. Ct. 1008; *Commonwealth ex rel. Bucksbarg v. Good,* 162 Pa. Superior Ct. 557, 58 A. 2d 842.

At the time of hearing in the court below certain exhibits were *marked for identification*: the warrant of the Governor of this Commonwealth, the warrant authorizing relator's arrest, the requisition papers signed by the Governor of the State of New York and the affidavit of the Governor of New York empowering two named New York City detectives to arrest relator. Although it appears from the record that the Commonwealth was content to rest its case upon the basis of these written documents, nevertheless the Commonwealth did call two witnesses. J. S. Desmond, a New York City detective, and Harold Vallely, the prosecutor.

Relator had been indicted in the County of New York on three criminal charges: extortion, grand larceny in the first degree and personating a public officer. An examination of the three count indictment indicates that relator is charged with having on October 29, 1956 personated a police officer and, while so doing, obtained from Harold Vallely $3500, in cash, upon the false threat that Vallely, unless he paid this money, would be accused of a crime, arrested and detained.

Desmond testified that he knew relator both as Edward Pacewicz and Edward Harvey and without qualification identified relator as the person named in the requisition papers of the Governor of the State of New York. Vallely, the alleged victim of the extortion, identified relator, stated that he had seen him on three occasions and that relator had come to his place of employment in New York on October 29, 1956—the date of the commission of the alleged crimes—and had been at his hotel room on two prior occasions.[1]

---

[1] Among the requisition papers is an affidavit by Vallely. In this affidavit Vallely stated that in October 1956, he and a casual male acquaintance were in his hotel room in the Hotel Plymouth, Manhattan, when the relator and another man came into the room

Relator's first objection is to the conduct of the hearing judge, conduct which he terms unfair and partial. Specifically, relator claims that the hearing judge was unfair and partial in three respects: (1) when he stated: "I am not going to tolerate these dilatory tactics any further. I have a long list. I am not going to make a big case out of this. There is no honest defense to this, and you know it"; (2) when he stated: "I am going to cut this [relator's counsel] cross-examination [of Vallely] short"; (3) when he refused to grant relator's motion for a continuance of the hearing for the purpose of presentation of alibi witnesses.

An understanding of the factual background is necessary to an evaluation of the hearing judge's conduct. On July 30, 1959, relator was originally brought before Judge McClanaghan and at that time relator's counsel told the court that he was going to file a petition for a writ of habeas corpus. Upon that representation of counsel, relator was released from custody upon posting of bail in the amount of $500. Despite relator's counsel's representation to the court, no petition for a writ of habeas corpus was presented until November 5, 1959—three months and five days after relator had been before Judge McClanaghan.[2]

---

and identified themselves as police officers; that relator in a conversation with Vallely, told Vallely that the police were looking for his companion and "it was too bad that he got mixed up with him"; on October 29, 1956 relator came to Vallely's place of employment with another man whom he introduced as "Chief"; on that occasion relator told Vallely that his acquaintance had been brought into court on charges on that same date and that, Vallely would be brought before the court unless he gave relator $3500 in cash; that he, Vallely, gave the two men, including relator, $3500 in $100 bills; that he had identified relator from a photograph shown him by the New York police.

[2] The *Uniform Criminal Extradition Act,* supra, §10, 19 PS 191.10 provides that such a petition must be filed within a "reasonable time".

On November 6, 1959—although the return day of the writ of habeas corpus was November 13, 1959—the parties appeared before Judge HAGAN and at that time relator's counsel stated of record: "We have no objection to it being heard today". The Commonwealth then proceeded with its case and produced the four exhibits, supra, and the witness Desmond. At this point it must be observed that the record before Judge HAGAN indicated that the Governor of New York, in accordance with the provisions of the Uniform Criminal Extradition Act, supra, had officially represented to the Governor of this Commonwealth that (1) the relator was charged with the commission of three crimes in the State of New York; (2) that the relator had been present in the State of New York on the date of the alleged commission of the crime, i.e., October 29, 1956; (3) that relator was a fugitive from the State of New York. Desmond's testimony then unequivocally identified relator as the person and individual named in the requisition papers. At that point in the hearing relator's counsel requested that "the prosecutor [Vallely] do something or other" and it was at that time the hearing judge made the first remark concerning which relator now complains. In view of the dilatory tactics pursued by relator's counsel and the clear and precise proof, through the medium of the written documents and Desmond's oral testimony that relator was in fact the person named in the requisition papers of the Governor of the State of New York, the hearing judge's remark is understandable. It is evident that relator's counsel, under the guise of a writ of habeas corpus, was attempting to secure a determination of relator's guilt or innocence of the offense with which he was charged in New York and for which he was being held for extradition.

Following the hearing judge's remark, Vallely testified. Upon completion of his testimony in chief, and

after he had answered twenty-nine questions on cross-examination, the hearing judge cut short the cross-examination. Up to that point Vallely had clearly and unequivocally identified relator as having been in the State of New York on October 29, 1956, the time of his alleged commission of the crime charged against him there. When the hearing judge put an end to the cross-examination, relator's counsel was attempting to discredit Vallely's *original* identification of relator by photographs in New York. The identification of relator as the person who had been in New York when the crime was committed was complete and what relator's counsel was then attempting to do was discredit Vallely's testimony, a matter for the courts of the demanding state rather than the courts of the asylum state. The issue before Judge HAGAN was whether relator was in the State of New York when the alleged crimes were committed and not whether relator was guilty or innocent of the commission of such crimes. The hearing judge very properly cut short relator's counsel's cross-examination.

Relator further complains that the hearing judge refused a motion for a continuance for the purpose of the production of witnesses to show that relator was not in the State of New York on October 29, 1956. Relator's counsel had already informed the court of his willingness to proceed. A hearing of the witnesses whose presence relator's counsel desired would have been of importance on the question of relator's guilt or innocence of the commission of these crimes and not his amenability to extradition. The question of the continuance of this hearing was a matter within the discretion of the hearing judge and we find on this record no circumstances indicating that he abused his discretion in this respect.

Relator's final attack on the proceedings in the court below is that the Commonwealth did not offer

nor did the court below receive in evidence the warrant of extradition, i.e., the warrant of the Governor of this Commonwealth, and, therefore, relator urges he is entitled to be discharged from custody. The Commonwealth had requested that four exhibits be marked for identification: (1) the "Governor's warrant"; (2) the "warrant for the arrest of the relator"; (3) the requisition papers of the Governor of New York; (4) "the affidavit of the Governor of New York" authorizing two named New York City detectives to arrest relator. After these four exhibits had been marked for identification and after Commonwealth's counsel had referred to the contents of the requisition papers, Commonwealth's counsel then stated to the court: "I move this *exhibit* into evidence". (Emphasis supplied). From this remark relator's counsel now argues that *only* exhibit 3—the requisition papers—were offered and received into evidence. The record furnishes no foundation for this argument. Immediately after Commonwealth's counsel had made this statement he referred the hearing judge to *Commonwealth ex rel. Mills v. Baldi,* 166 Pa. Superior Ct. 321, 70 A. 2d 439, wherein the Superior Court stated: "Where, in such proceeding, the *executive warrant* and the requisition in the extradition proceeding are introduced in evidence, a prima facie case is made out". (Emphasis supplied). It is clear and explicit that Commonwealth's counsel meant and that the hearing judge and relator's counsel so understood that *all four exhibits* of the Commonwealth had been received in evidence. The hearing judge in his opinion stated: "At the hearing the Commonwealth introduced in evidence the warrant of the Governor of the State of Pennsylvania (Exhibit No. 1), the warrant for the arrest of the defendant (Exhibit No. 2), and the warrant of the Governor of the State of New York (Exhibit No. 3)". All four exhibits were properly in evidence and part of the record before the

hearing judge. Furthermore, at no time in the court below did relator's counsel allege or contend that the Commonwealth had failed to introduce these exhibits into evidence. We cannot entertain such a complaint at this time and, furthermore, if we could, the record shows that such complaint is without merit.

After a careful examination of the record of the hearing in the court below, we are satisfied that the Commonwealth established that relator was subject to extradition to the State of New York, that relator received a fair and impartial hearing and that the action of the court below in refusing to discharge relator from custody was fully justified.

Order affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On July 7, 1959, the Governor of New York asked the Governor of Pennsylvania, through appropriate legal extradition proceedings, to deliver to New York police authorities one Edward Pacewicz, then in Philadelphia, to answer to charges in New York of extortion, larceny and personating a police officer. On July 14, 1959, the Governor of Pennsylvania issued a warrant directing that Pacewicz be taken into custody. Pacewicz was arrested and he petitioned for a writ of habeas corpus which duly issued.

On November 6, 1959, the petitioner appeared before the Court of Common Pleas of Philadelphia County for a hearing on the writ. The assistant district attorney, Mr. Balka, presented the extradition papers and the court ruled that this in itself made out a prima facie case for extradition. The attorney for the defendant, Mr. Levy, protested this ruling since the Commonwealth had not identified the defendant as the person named in the extradition papers. Mr. Balka then called to the witness stand a New York detective who testified that he knew the man named in the ex-

tradition papers. Mr. Levy objected that this testimony was mere conclusion on the part of the witness. His objection was overruled and then the following occurred: "By Mr. Balka: Q. Is that man in the court room? A. Yes, he is. Q. Would you point him out? Mr. Levy: We ask that the prosecutor—THE COURT: I am not going to tolerate these dilatory tactics any further. I have a long list. I am not going to make a big case out of this. There is no honest defense to this, and you know it. Mr. Levy: We would ask Your Honor to disqualify yourself, so that someone else may hear this. We have a good defense. THE COURT: Overruled."

When the hearing ended, the court ordered Pacewicz to be surrendered to the New York authorities and Pacewicz appealed.

Pacewicz contends that he was denied due process, urging that, before he had an opportunity to attack the regularity, legality and sufficiency of the extradition charges, the judge gave evidence of having prejudged the issue raised by the writ of habeas corpus.

Taking a man from one sovereign State and sending him into another against his will is such an obvious invasion of his liberties that his forcible removal can be justified only by a meticulous observance of all requirements of the law. Under the provisions of the Uniform Criminal Extradition Act of 1941 (July 8, 1941, P. L. 288, 19 PS §191.1 et seq.), the requisition of the demanding state will be sustained and extradition ordered only when four conditions coincide: (1) that the subject of the extradition is charged with a crime in the demanding state; (2) that he was in the demanding state at the time of the commission of the crime charged; (3) that he is a fugitive from the demanding state, and (4) the requisition papers are in order.

Obviously, before the Extradition Act can attach at all, proof must be adduced that the arrested person is the person the demanding state is seeking. We said in *Com. ex rel. Dronsfield v. Hohn,* 390 Pa. 434, that: "The relator is entitled to be discharged by Courts of the asylum state if his identity is not established, because in such a case he would not be the person who was charged with the crime in the demanding state nor a fugitive from the demanding state."

In the endeavor to establish the identification required by law, the Commonwealth produced the New York detective already mentioned, who testified that he did not know whether or not the defendant was in New York on October 29, 1956, the date of the alleged crime or crimes, and that he could identify him only because his name was Pacewicz. However, even before this had transpired, the court, as above stated, declared that he was not going to tolerate any "dilatory tactics" because there was no "honest defense" and because he, the judge, had a "long list," meaning that he had many other cases to hear or try.

The fact that the judge had a long list of untried cases was entirely irrelevant and did not justify his giving the case presently before him inadequate attention and consideration. Justice cannot be measured by the number of cases decided, but only by the number of cases decided correctly or, at least, tried with all constitutional safeguards protected. The surgeon who neglects proper hygienic and antiseptic preparations for operations, because he has an excess of patients, might better serve humanity by operating on less people and curing them than by cutting into more people and leaving them in worse shape than before picking up the scalpel.

A habeas corpus hearing in an extradition case is not merely an empty procedure; it is a substantive action of grave import and the hearing judge must not

arbitrarily assume that the defendant is undoubtedly guilty and is merely resisting the castigation which presumably awaits him in the demanding State. In the *Dronsfield* case, supra, we affirmed the lower court's finding to the effect that: "The evidence is overwhelmingly to the effect that the relator was not in Winslow, Arizona, or in any other part of Arizona on June 2, 1951, and that his identification as the man who cashed the check in Starr's jewelry store in Winslow, Arizona, was so weak as to be unworthy of belief by this court."

While the purpose of the habeas corpus hearing is not to adjudicate the eventual guilt or innocence of the defendant on the crime charged, neither is it, on the other hand, a mere technical prerequisite to forced transportation. We have seen in the case at bar that the New York detective's identification of Pacewicz was inconclusive since he had no personal contact with the defendant and actually only testified to hearsay. Later, in the hearing, a man by the name of Harold Vallely stated that he had seen the defendant two or three times in October, 1956, had not seen him since, and had identified him by photograph about a year prior to the hearing.

The Majority Opinion states that the named Vallely "clearly and unequivocally identified relator as having been in the State of New York on October 29, 1956, the time of his alleged commission of the crime." The Majority apparently is of the opinion that so long as some one takes the stand and asserts the defendant committed a crime, the requirements of the extradition statute have been met. Under this standard, a hopeless imbecile could come into court and point a shaking finger at a high church dignitary of the purest character and unblemished reputation, and, upon that showing, the dignitary would be powerless to resist extradition. Under this criterion of proof a malefactor,

perjurer and criminal could point to anyone he chose as the victim of his intended malefactions and, according to the Majority reasoning, such skeleton procedure would be enough to force the victim into another state. It is, however, gratifying to know that the liberties of the citizens of this land stand on a more secure footing than that.

No witness's testimony in court is of any value unless the person against whom it is directed has the fullest opportunity to cross-examine him for the purpose of testing his credibility. Particularly is this true in extradition cases. Identification without cross-examination of the identifier is as valueless as identification by the north winds.

The Majority is of the impression that the constitutional rights of cross-examinations were satisfied because defendant's counsel was allowed to put 29 questions to the prosecuting witness. If one counts the number of "Q's" in the record, it is true that they total up to 29, but this, I submit, is no way of determining whether the cross-examination was adequate under the circumstances. Even 129 questions might not be enough in a given case. It so happens here, however, that the statement the cross-examiner put 29 questions is misleading, because, to some of the questions the Commonwealth interposed objections, and the objections were sustained by the Court. For instance: "Q. Now, did you ever supply the police with the name of Edmund Pacewicz? Mr. Balka: Objected to. THE COURT: Objection sustained."

And then: "Q. Did you give a description of the person? Mr. Balka: Objected to. THE COURT: Objection sustained."

Again: "Q. When did you issue the affidavit for Mr. Pacewicz? Mr. Balka: I think that is in the extradition record. THE COURT: It hasn't been stated of

record the obvious thing, that he is the prosecutor in this case."

And then, it is to be noted that the answers to some of the questions disproved, rather than proved, the prosecuting witness's case. For instance: "Q. Did you give a description of this person to the police at any time? A. No. Q. Never? A. No."

If the prosecuting witness gave no description to the police of the alleged culprit, how did the police pick up Pacewicz and how did they know that they had the right man? Of course, the police could have gotten a description of the man through an identifying photograph, but here we come to the crux of the court's failure in this case. Mr. Levy asked the prosecuting witness: "At that time you were shown a photograph?" and the witness answered: "Yes."

Then defendant's counsel asked: "How many photographs were you shown?" This was a perfectly proper and, in fact, indispensable question, because if the police showed him only one photograph, this would be no test of identification at all. Reliable identification can be assured only when the complaining witness selects the alleged culprit from a number of persons, or identifies a photograph from a number of photographs.

And here, I repeat, the court went astray. It was at this point that the trial judge again began to worry about the long list of other cases he had to try. Without even allowing the witness to answer, he broke in with: "I am satisfied there is sufficient identification, and I am going to cut this cross-examination short."

How can this Court gloss over such a palpable invasion of an accused's rights? A cross-examination may be cut short when it ceases being a search for truth, and becomes, instead, a vehicle for abuse, purposeless argumentation and meaningless repetition, but the record reveals no such faults on the part of the cross-examiner here. Judicial and police authorities should

realize that it is a very serious matter to seize a man in his home, take him from his employment, wrest him from his companions, uproot all his family and social obligations, disorganize his whole life, both present and future, to transport him to another State (even though eventually he might be acquitted), when there is the possibility that he is not the person sought. And the least right that can be afforded the accused in such a situation is to permit him to cross-examine thoroughly the accuser to determine if he might not be mistaken, might not have erred, might not have stumbled.

When the court in this case cut short the cross-examination it was Justice which stumbled.

However, it would appear, ironically, that the trial judge was over-indulgent in allowing the cross-examiner 29 questions because it is apparent from the record that the judge intended all the time to dismiss the writ of habeas corpus, and the hearing was simply a phantom performance. After the Commonwealth had produced the extradition papers, the judge ruled that the Commonwealth had made out a prima facie case. Of course, it is rudimentary that this is not so. The papers are a mere nothing until the defendant in court is identified as the person named in the papers. Accordingly, defendant's counsel expressed amazement at the court's observation and he remarked: "Do I understand, though no one has identified the defendant in this case—"

To this most natural query, the court made the most unnatural answer. The court said: "You have identified him." (!)

And when defendant's counsel recovered from this second startling statement from the bench, counsel said: "No I have not."

And then the court made the most startling statement of all, namely, "He is produced here today as the defendant."

In other words, a man is arrested and charged with being a fugitive from justice. He denies that he is a fugitive and he petitions for a writ of habeas corpus to protect his liberty, and then when he comes into court to demand that the police authoriites prove that he is the person wanted in the extradition papers the court says: You must be the man because you are here!

The Majority states that the relator "received a fair and impartial hearing." This, in spite of acknowledging that the hearing judge said: "I am not going to tolerate these dilatory tactics any further. I have a long list. I am not going to make a big case out of this. There is no honest defense to this, and you know it." Is any case involving a man's liberty anything less than a big case?

Is a hearing fair and impartial when the judge says, before he even hears the prosecuting witness: "There is no honest defense to this, and you know it."

Is a hearing fair and impartial when the judge charges the defendant's counsel with presenting a dishonest defense when he has heard no defense?

The Majority has decided that the judge's remarks do not constitute reversible error. What the Majority fails to recognize is that a judge's remarks are a reflection of his attitude. The judge was not making an observation on the weather or a ball game. He said in open court, before hearing the evidence, that there was no defense. If that is not reversible error, the Majority should indicate how far a judge should go before he disqualifies himself as being incapable of being an impartial arbiter.

The prejudice of the judge in this case was evidenced at the very threshold of the case. The very first question put by defendant's counsel was an obviously fair one, namely, "Could we ask if the prosecut-

ing witness in this case would be asked to identify the defendant from the body of the court room?"

The court ignored the request. Later the assistant district attorney asked the detective in this case to point out the defendant in the courtroom. The detective replied: "Yes. He is in the far corner of the court room in the brown suit and glasses."

This identification surprised the judge because he thought the defendant was standing at the bar, and from surprise he went to anger, addressing himself to defendant's counsel as follows: "Are you trying to deceive the court by not having the defendant at the bar?"

This remark was distinctly unfair. A lawyer's life is in many ways a hard one. Since, in faithfully representing his client's interests, he is constantly engaged in controversy, he must, in the ring of battle, inevitably receive many a blow from his adversary. However, he should have the right to expect that he will not receive blows from the referee.

There is nothing in the record to justify the judge's remark that defendant's counsel was engaging in deceptive practices. Since the whole purpose of the hearing was to determine whether the arrested person was in fact the alleged fugitive, defense counsel was merely exercising understandable prudence in asking that the prosecuting witness be required to pick out the alleged culprit from a number of people. If the defendant was to be presented to the court as *the* culprit, there would be no purpose in having a hearing at all.

The Majority says that the issue before the judge was "whether relator was in the State of New York when the alleged crimes were committed and not whether relator was guilty or innocent of the commission of such crimes."

But before there can be an inquiry as to whether the relator was in the demanding state when the al-

leged crimes were committed there has to be a determination as to whether the relator is the person charged in the extradition papers. This is so fundamental that it is wearisome to spend time discussing it, yet it is sometimes these very fundamental premises which are overlooked in the disposition of matters involving human liberties.

The Majority says that the question of guilt or innocence of the relator of the alleged crimes in New York was not involved. That is absolutely true. I make no observation on what an eventual trial in New York might determine but before there can be a trial in New York of a person now in Pennsylvania there must be clear proof that the person arrested in Pennsylvania is indeed the person wanted in New York. That was the whole purpose of the habeas corpus proceeding, not whether the trial judge had a long list ahead of him or not.

This entire controversy could have been entirely avoided if the trial judge had simply allowed some reasonable latitude in cross-examination if for no other reason than to show that no unfair advantage had been taken of the accused. The Commonwealth seeks to justify the curtailment of cross-examination by arguing: "The practical fact of a non-jury trial, or for that matter a jury trial, is that the trier often reaches a conclusion before the absolute end of the hearing when the quality of the evidence is incontrovertible."

While it is true that nothing can prevent thought processes from leaping to conclusions, a conscientious regard for one's responsibilities should restrain a considerate judge or jury from formulating a *decision* before the last witness on the controverted event is heard. Regardless of the seeming preponderance of evidence on one side, the door of judgment must be left open until relevant, competent and non-repetitive evidence which is available may be produced.

The Commonwealth speaks of its evidence as being "incontrovertible." The Commonwealth's evidence was very much controverted. The Commonwealth seems to be of the impression that so long as what it deems a proper result is attained, it does not matter how a hearing is conducted. Specifically the Commonwealth argues: "In cases such as the one at bar, that result is proper when the evidence of one party is irrefutable and the adverse contention is fallacious."

If the evidence presented by the Commonwealth was irrefutable it was only because of the intransigent position taken by the judge who refused to permit cross-examination which might have shown that the Commonwealth's case was perhaps refutable. But the judge assumed at the very outset, as indeed the Commonwealth dogmatizes, that the defendant's contention was "fallacious." But fallacy is determined by listening to evidence and deliberating on it. Such deliberation was not conspicuous in this case, and when a judge closes his mind before hearing evidence, he closes the door to the Temple of Justice.

I dissent.

Mr. Justice EAGEN joins in this dissent.